UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:09-cr-29 |
| | ) | MATTICE/CARTER |
| PAPA DOUDOU MBODJI | ) | |

REPORT AND RECOMMENDATION

## I. Introduction

Defendant's Motion to Suppress Evidence (Doc. 16) is pending before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). Defendant's motion arises from a traffic stop occurring on May 2, 2006, made by Officer Eduardo Choate along I-75. Defendant asserts the search of his vehicle was in violation of the Fourth Amendment of the United States Constitution. Defendant also asserts that as a result of the illegal search and seizure, he made statements to agents that should be suppressed as fruit of the poisonous tree. For the reasons stated herein, it is RECOMMENDED Defendant's motion to suppress (Doc. 16) be DENIED.

## II. Relevant Facts

The undersigned held an evidentiary hearing on Defendant's motion to suppress on Monday, December 28, 2009. Attys. Rita LaLumia, Wilson Von Kessler, and Steve Ferrell represented Defendant. The government was represented by Asst. United States Attorney James Brooks. The government presented two witnesses.

1

*1. Eduardo Choate*

Edurado Choate, formerly of the Bradley County Sheriff's Department, testified to the following: He had been employed by the Bradley County Sheriff's Department for 3 years at the time of the traffic stop in question. At the time of this incident, he was working as a K-9 detective. On May 2, 2006, he was working in speed enforcement on I-75 at mile marker 27 facing southbound traffic where the speed limit is 70 mph. At approximately 10:30 am, Choate observed a silver Saab convertible traveling at a high rate of speed, which from his experience he determined was going well over 80 mph. Using a certified calibrated radar, Choate registered the Saab at a speed of 86 mph. When Choate began to follow Defendant's vehicle, Defendant swerved into the emergency lane. After observing Defendant speeding and swerving, Choate drove behind the vehicle and turned on his blue lights. The vehicle pulled over to the side of the road near mile marker 25. When Choate approached the vehicle, the only person in the vehicle was Defendant, whom Choate identified in court.

Defendant told Choate the reason he was speeding was because he had to go to the bathroom. Choate noticed, however, that Defendant had passed another exit just before Choate stopped him. Choate asked why he passed the earlier exit. Defendant was unable to explain this inconsistency. Choate noticed that Defendant was shaking and sweating and appeared to be very nervous. Defendant provided Choate his driver's license and registration and then, upon Choate's recommendation, they both drove to the next exit so Defendant could use the bathroom while Choate checked the validity of Defendant's registration and license. At the next exit, Defendant went into the bathroom but quickly returned to his vehicle. Choate estimated that

Defendant spent less than two minutes in the bathroom. When Defendant returned he was still sweating and acting very nervous.

Choate ran Defendant's license and vehicle registration through Blue Lightning Operations Center ("BLOC"), a database of information maintained by the Bureau of Immigration, Customs and Enforcement Agency. Choate found that Defendant's vehicle was registered to a person named Erik Estrada Crutchfield and that another individual, Eddie Roy Moon, was a co-owner of the vehicle. Choate also learned that Eddie Roy Moon had prior arrests and convictions for distributing cocaine and marijuana. Choate then spoke with Defendant about the registration of the vehicle. Defendant told Choate that he was working in Georgia building homes with Crutchfield. Defendant told Choate that Crutchfield had loaned him the vehicle to go to Atlanta to visit his son and wife and he was to return the vehicle the same day. Defendant stated that he had borrowed the vehicle from Crutchfield who was in Georgia. Choate asked Defendant where he was when he borrowed the vehicle from Crutchfield and Defendant responded that he borrowed the vehicle in New Jersey. This contradiction was never explained and, ultimately, Defendant stated he was too tired to provide an intelligible explanation. Choate testified that the exchange regarding the Defendant's travel plans was bizarre and confusing.

Choate then explained to Defendant that I-75 is a major corridor for contraband. Choate asked Defendant whether he had any drugs, large sums of money or hidden compartments in his vehicle. Defendant said he did not. Choate asked Defendant if he could search the vehicle for drugs, money, and hidden compartments. Defendant said he could. Defendant was "very kind" and cooperative. Defendant did not appear to have any trouble understanding what Choate was

3

saying. Choate testified that except for the conversation they had about the Defendant's travel plans, Defendant's responses to all his statements and questions had been reasonable and logical. Choate had Defendant stand nearby, unrestrained, between Choate's patrol car and the Saab. When Choate searched the front seat area, he noticed metal dust shavings under the front seat carpet. He also noticed an excessive odor of car fresheners and that the four bolts securing the rear seat had been heavily scratched. Choate asked Defendant if he knew anything about the rear seats, and Defendant answered he did not.

At that time, Choate requested backup for his personal safety before conducting a more thorough search. Choate testified that at no time during this search did Defendant object or withdraw his consent. Upon further examination, Choate noticed that the bolts holding the speakers appeared to have been removed. Based on training and experience, Choate knew that the shavings and the scratched bolts were indications that Defendant's vehicle had been modified to contain compartments that could conceal narcotics and/or money. Choate pulled back on one of the speaker covers and the bottom bolts fell off from the rear metal wall because they had been stripped. Choate reached inside with his fingers and felt soft plastic. Choate looked more closely and saw numerous bundles of United States currency. Choate testified that at that time he had a suspicion that there were drugs hidden behind the money, as well. Upon discovering the hidden compartment and currency, Choate ordered another officer to place Defendant in custody. Defendant disclaimed any knowledge about the money.

Because he realized it was a large sum of money, Choate and the officers decided to continue the search at the Bradley County Sheriff's drug enforcement office. Choate testified that at the office, Defendant had his *Miranda* rights read to him.

4

The money was packed in the compartment very tightly in kilo sized bricks. They discovered 36 bundles of money in all. In his testimony, Choate explained that his experience informed him that these compartments are typically made to hide drugs, and were built for kilos of cocaine. On May 2, 2006, $576,414 was discovered. No drugs or other contraband were discovered, though a later swab analysis showed cocaine residue in the compartment. Once all the money was counted, which was several hours later because of the quantity, Defendant signed a waiver saying he had no ownership or connection with the money.

At the office, Defendant was in custody and seated on a couch in the officers' presence. At some point while he was at the drug enforcement office, Defendant stated he was sick. He was taken to Bradley Memorial Hospital at approximately 4:30 p.m. where he was admitted. Choate did not drive him to the hospital because his vehicle was not equipped with the appropriate safeguards, but he did accompany Defendant throughout his stay at the hospital. Defendant received treatment at the hospital for hyperglycemia and was discharged about two hours later. It was upon release from the hospital that Defendant signed the aforementioned waiver concerning the money.

While discussing the discovery with his partner the next day, Choate began to wonder if there were more compartments. They searched the vehicle again and discovered two more compartments hidden underneath the body of the vehicle, which contained bundles of currency worth $288,514. In total, the vehicle had $864,928.00 hidden in the various compartments. Defendant was released and not charged with any crime related to the seizure.

*2. Wayne Jackson*

Special Agent Wayne Jackson of the Federal Bureau of Investigation assigned to the Chattanooga office testified to the following: Agent Jackson has been working in the FBI for 27 years and is the primary agent for Defendant's case. After the money was discovered in the Saab, Defendant was not charged with any crime related to the money. Defendant was released and law enforcement did not contact him.

In October of 2006, Defendant initiated contact with Agent Shelton, who had been at the scene of the vehicle search, to discuss the money seized. Defendant asked if Shelton would help him recover the money and offered Shelton a portion of the money, $78,000, in return for his help. Agent Shelton used a hidden tape recorder to record the conversation between himself and Defendant. Later that day, in the presence of Shelton and another DEA task force officer, Defendant claimed, despite his earlier statements, that he had a possesory interest in the money. After this conversation Defendant did not contact authorities again for some time.

On April 24, 2007, Defendant again contacted Shelton. Defendant stated that he had been in Africa and was still interested in attempting to get the money returned. Shelton told Defendant he would call him. On April 26, 2007, Shelton returned the call to Defendant. Shelton recommended that Defendant travel to Chattanooga to recover the seized money.

On April 30, 2007, Defendant traveled to Chattanooga and met with Shelton. This meeting was electronically monitored. During this meeting, Shelton proposed a scheme to get the seized money back. However, after this meeting, Defendant ceased to contact the authorities for approximately seven months.

On November 12, 2008, about 30 months after the initial stop, Defendant again contacted Shelton. Between November 2008 and February 2009, Defendant and Agent Shelton engaged in a number of conversations in which Defendant committed to a scheme to recover the seized money. In summary, the scheme involved paying a clerk in the Bradley County clerk's office to remove some items from the forfeiture file. Defendant agreed to pay the clerk $10,000 and some up-front money to Shelton.

Special Agent Jackson gained his knowledge about these events through reading the reports and conversations with Shelton.

### III. Discussion

Defendant asserts any and all evidence obtained on May 2, 2006 and May 3, 2006 as a result of the search of his vehicle should be suppressed because the search was made without sufficient probable cause. Defendant further contends that any statements made to authorities as a result of the search should be excluded as fruit of the poisonous tree.

*1. Stop*

When police have probable cause to believe the driver of a vehicle has committed a traffic violation, they may stop the vehicle. *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (so long as the officer has probable cause to believe that a traffic violation has occurred, the resultant stop is not unlawful and does not violate the Fourth Amendment); *United States v. Ferguson*, 8 F. 3d 385, 391 (6th Cir. 1993) (A traffic stop is reasonable if there is probable cause to believe a traffic violation occurred, and it is irrelevant whether the officer had any suspicions about the driver.) Here, Choate testified that he saw and confirmed with radar that Defendant was traveling 86 mph in violation of the 70 mph speed limit. *See* Tenn. Code.

7

Ann § 55-8-152(c) (specifying it is unlawful for anyone to operate a motor vehicle in excess of 70 mph).

Defendant does not argue that the initial stop was unreasonable. Defendant does not argue that Choate unlawfully continued the detention without the requisite cause to believe "criminal suspicion was afoot." A traffic stop includes those normal activities which are routinely carried out during such a stop, *e.g.,* checking the driver's license, registration, and proof of insurance. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Hill*, 195 F.3d 258, 269 (6th Cir.1999). The driver of a vehicle may be detained until after the officer has finished verifying the driver's license and checking other records as these acts are within the purposes of the initial stop. *See United States v. Ellis*, 497 F.3d 606, 613-14 (6th Cir. 2007) (asking for identification and about one's travel itinerary and purpose of travel was appropriate during traffic stop); *United States v. Garrido-Santana*, 360 F.3d 565, 572-74 (6th Cir. 2004) (rejecting defendant's contention that reasonable suspicion was necessary to continue to detain driver after valid traffic stop for speeding in order to conduct computer check of driver's license even though courtesy citation for speeding had already been issued); *Hill*, 195 F.3d at 269 (driver's license check, which was completed after citation for traffic offense was issued, was within original scope of traffic stop). Police may also lawfully ask for consent to search and whether the driver possesses contraband during the course of the traffic stop. *See United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003) (asking for consent to search did not unreasonably extend the scope of an ordinary traffic stop)*; see also, Ohio v. Robinette*, 519 U.S. 33, 36 (1996); *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996); *United States v. Martinez*, 356 F. Supp.2d 856, 863 (M.D. Tenn. 2005). Moreover, "[a]n officer's inquiries into matters unrelated to the justification

8

for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 129 S.Ct. 781, 788 (Jan. 26, 2009).

Once the purpose of the traffic stop is completed, the officer may not "measurably extend the duration of the stop" unless further information arises to support reasonable suspicion sufficient to justify continued detention. *Id.*; *see also*, *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). "Reasonable suspicion is more than an ill defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity," given the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *accord*, *United States v. McCauley*, 548 F.3d 440, 444-45 (6th Cir. 2008).

Choate learned through his BLOC search that the vehicle was not owned by Defendant and that it was co-owned by a convicted drug dealer. He then asked Defendant questions relating to this discovery. These questions concerning vehicle registration and ownership are reasonably related to the traffic stop. Immediately after asking about the ownership of the Saab, Choate asked about contraband in the vehicle and whether he could search it. As previously discussed, such questions do not unreasonably extend the scope of the traffic stop so as to violate a driver's Fourth Amendment rights. Therefore, Defendant's argument that Choate had to have reasonable suspicion at the time he asked for consent to search in order to meet constitutional muster is unpersuasive. I conclude defendant was legally detained at the time Choate requested consent to search.

9

## *2. Validity of Consent*

A search conducted pursuant to a valid consent is a well-recognized exception to the general warrant requirement of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). A search may be conducted without a warrant if a person with a privacy interest in the place to be searched gives free and voluntary consent. *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002). The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. at 227. The appropriate inquiry is whether, taking into account all the circumstances surrounding the encounter, a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter. *Florida v. Bostick,* 501 U.S. 429, 435-37 (1991). The government must establish that consent was voluntary by a preponderance of the evidence, with evidence that is clear and positive. *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009); *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998). For consent to be voluntary, it must be unequivocal, specific, intelligently given, and free from duress or coercion. *Canipe*, 569 F.3d at 602; *Erwin,* 155 F.3d at 823 (citing *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978)).

Choate did not threaten or coerce Defendant into giving consent, nor did he trick Defendant. In fact, Choate testified that Defendant was cooperative and very kind in granting consent. While Defendant's brief asserts he did not give consent, he presented no evidence to rebut Choate's testimony at the hearing. The undersigned finds Choate's testimony to be

credible, and without evidence to the contrary, finds that the consent was valid.[1]  Further, Defendant was fully able to withdraw his consent or limit the search while standing between the two cars, but he did not do so.  Even though the search was quite extensive, with Choate actually removing bolts underneath the back seat to get to the hidden compartment, the search did not exceed the scope of consent given.  Choate was clear to defendant that he would be looking for hidden compartments and contraband; thus, a reasonable person would have understood that Choate would be conducting a very thorough search of the Saab.  *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); *see also, United States v. Garrido-Santana,* 360 F.3d 565, 576 (6th Cir. 2004)  (search of the gas tank was within scope of search where general consent was given after officer asked if driver possessed any

---

[1] A stipulation was submitted by Defendant on December 30, 2009 with which the parties agreed to supplement the record in lieu of filing medical records related to Defendant's hospital treatment on May 2, 2006. The stipulated evidence shows Defendant was treated for hyperglycemia at 4:37 pm, six hours after the traffic stop.  He had a glucose level of 336 (where the indicated range is 10-105).  Defendant has not argued that his medical condition rendered his consent involuntary.  Defendant has argued he did not give consent at all – in any form.  Nevertheless, I will briefly address Defendant's ability to give a valid consent to search in light of the stipulation concerning his medical condition on May 2, 2006.  Choate testified that Defendant understood the request for consent to search, Defendant was cooperative, Defendant's appearance and behavior appeared to him to be shear nervousness, Defendant did not mention feeling sick before or during the search, and Defendant did not object to the search at anytime though he was behind the Saab and able to communicate with Choate. While Defendant did give an incoherent response to initial questions concerning his travel plans, his answers to other, subsequent questions were clear and coherent. Defendant's episode of illness was considerably removed in time from the traffic stop, and the evidence before the undersigned does not indicate Defendant was ill at the time Choate asked for consent.  Rather, as previously discussed, the evidence indicates Defendant voluntarily and knowingly gave his consent to search his vehicle.

illegal contraband such as drugs or stolen goods).  I conclude the search of Defendant's vehicle did not violate his constitutional rights.

### 3. Statements as Fruit of the Poisonous Tree

Because the undersigned has determined there was valid consent, there was no illegality to taint future statements. All statements made by Defendant relating to the search of the vehicle are admissible.  However, even assuming, *arguendo*, that the search was in violation of Defendant's Fourth Amendment rights, the statements Defendant seeks to have suppressed relate to a crime (alleged) that was not even committed at the time his vehicle was searched.  Thus, the fruit of the poisonous tree doctrine arguably does not apply.  *See United States v. Tab*, 259 Fed. Appx. 684, 689-90 (6th Cir. 2007) (defendant's act of shooting at officer during search constituted a new crime which in turn rendered the fruit of the poisonous tree doctrine inapplicable to evidence of the new crime) (citing *Feathers v. Aey*, 319 F.3d 843, 852 (6th Cir. 2003)) (holding "fruit of the poisonous tree" doctrine does not protect a defendant who has committed a crime during an unconstitutional search).

Moreover, even if the fruit of the poisonous tree doctrine was arguably applicable, the statements at issue would be sufficiently attenuated due to time, voluntariness of Defendant, and subsequent illegal conduct by Defendant to purge them of the taint of an illegal search. *United States v. Ceccolini*, 435 U.S. 268, 279-280 (1978) (indicating that both voluntariness of the witness and passage of time dissipated the taint of illegal search); *accord, United States v. Akridge*, 346 F.3d 618, 625-66 (6th Cir. 2003).  I, therefore, conclude that Defendant's fruit of the poisonous tree argument also fails.

IV. Conclusion

Therefore, for the reasons stated herein, it is RECOMMENDED that Defendant's motion to suppress(Doc. 16) be DENIED.[2]

Dated: January 8, 2010
s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).